## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. DAVID GILL<br>24 Conway Circle<br>Bloomington, Illinois 61704,<br><br>FRIENDS OF DAVID GILL<br>24 Conway Circle<br>Bloomington, Illinois 61704,<br><br>CITIZENS FOR RESPONSIBILITY AND<br>ETHICS IN WASHINGTON<br>1400 Eye Street, N.W., Suite 450<br>Washington, D.C. 20005<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE TREASURY<br>INTERNAL REVENUE SERVICE<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220<br><br>Defendant. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This is a civil action under the Administrative Procedure Act ("APA"), 5 U.S.C. §

706, challenging as arbitrary, capricious, and contrary to law a regulation promulgated by the

Internal Revenue Service ("IRS") that implements a provision of the Internal Revenue Code (the

"Code") defining those organizations entitled to a tax exemption because they operate

exclusively for the promotion of social welfare, and the application of that regulation to

plaintiffs.

## JURISDICTION AND VENUE

2. This Court has personal and subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 (action arising under the laws of the United States), 5 U.S.C. §§ 701, 702, and 706 (Administrative Procedure Act), and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act).

3. Venue in this district is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

4. Plaintiff Dr. David Gill was the Democratic candidate for Congress for the 13th Congressional District of Illinois in 2012. Dr. Gill was defeated by Rodney Davis due largely, if not exclusively, to the expenditure of money by the American Action Network ("AAN") in opposition to Dr. Gill's candidacy.

5. As a result of the large sums of money AAN spent on television advertisements and political robocalls advocating for the defeat of Dr. Gill, Dr. Gill suffered economic harm. Specifically, Dr. Gill was forced to spend campaign funds in an effort to counter the false and misleading advertisements funded by AAN. Further, Dr. Gill had to spend campaign funds on attorneys' fees incurred in preparing and sending cease and desist letters to broadcast stations in an attempt to stop the stations from airing advertisements funded by AAN that contained false statements. Dr. Gill also lost wages, as he was required to substantially reduce his hospital work hours to spend time refuting the allegations made in political advertisements by AAN, and to make fundraising appearances and calls to generate additional resources to counter the money AAN was expending to defeat his candidacy.

6. Dr. Gill also suffered harm to his reputation from the political advertisements funded by AAN, which were designed to harm Dr. Gill's public image and reputation as a physician. AAN received money from Aetna as well as pharmaceutical companies seeking to defeat Dr. Gill, which it used to fund, at least in part, the political advertisements it ran against Dr. Gill.

The television advertisements AAN financed painted Dr. Gill as a "mad scientist," thereby harming Dr. Gill's public image and reputation as a practicing physician.

7. After the IRS approved AAN's application to be recognized as exempt under section 501(c)(4) of the Code, AAN held itself out as a tax-exempt 501(c)(4) organization. Consistent with this status, AAN did not identify the sources of funds it used to help defeat Dr. Gill. As a result, the public was not aware advertisements AAN was funding to defeat Dr. Gill were financed in large part by pharmaceutical and health insurance companies that sought to defeat Dr. Gill because he is dedicated to changing the health care financing system through a single-payer, national health care plan, which would eliminate the system that currently enriches them.

8. If, as a 501(c)(4) organization, AAN had operated exclusively for the promotion of social welfare, it would not have been able to fund the political advertisements or robocalls it used to defeat Dr. Gill. Dr. Gill, in turn, would not have had to spend campaign funds attempting to counter the barrage of negative political advertisements AAN financed, and would not have suffered harm to his reputation as a result of those advertisements.

9. While Dr. Gill currently is not actively campaigning for public office, he has not ruled out the possibility of running again to fill the 13th Congressional District seat in Illinois.

10. Plaintiff Friends of David Gill is the principal campaign committee for Dr. Gill, and was authorized to make expenditures on his behalf in the 2012 election.

11. As a result of the large sums of money AAN spent on television advertisements and political robocalls advocating for the defeat of Dr. Gill, Friends of David Gill suffered economic harm when it was forced to spend campaign funds in an effort to counter the false and misleading advertisements funded by AAN. Friends of David Gill also was harmed when it had to spend

campaign funds on attorneys' fees incurred in preparing and sending cease and desist letters to broadcast stations in an attempt to stop the stations from airing advertisements funded by AAN that contained false statements. Further, Friends of David Gill suffered economic harm from the additional staff and consultants it had to pay in order to respond to AAN's political advertisements, including time spent strategizing, drafting media statements, talking with reporters, preparing materials for counsel, and answering calls and inquiries from potential voters and supporters about the veracity of the advertisements. In order to respond to AAN's attack of Dr. Gill as a physician, Friends of David Gill had to develop, produce, and air advertisements to counter AAN's advertisements, using time and funds that otherwise would have been spent on advertisements addressing the issues in the campaign.

12. If, as a 501(c)(4) organization, AAN had operated exclusively for the promotion of social welfare, it would not have been able to fund the political advertisements or robocalls it used to defeat Dr. Gill. Friends of David Gill, in turn, would not have had to spend campaign funds attempting to counter the barrage of negative political advertisements AAN financed.

13. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit, non-partisan corporation organized under section 501(c)(3) of the Code. CREW is committed to protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, and protecting the integrity of our political system against corruption. CREW works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency. Further, CREW seeks to ensure campaign finance laws are properly interpreted, enforced, and implemented. To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to

the public about public officials and their actions. Part of CREW's work includes exposing the special interests that have influenced our elections by secretly pouring vast amounts of money into the political system, often shielding the sources of money through the use of tax-exempt 501(c)(4) organizations.

14. The Internal Revenue Service ("IRS") is a component of defendant U.S. Department of the Treasury, which is an agency within the meaning of 44 U.S.C. § 2901(14) and 5 U.S.C. § 701(b)(1). The IRS is responsible for implementing the Code, including through the promulgation of regulations and the approval of applications for tax-exempt status pursuant to section 501(c)(4) of the Code.

## STATUTORY AND REGULATORY FRAMEWORK

15. In 1913, Congress for the first time provided a tax exemption for "any civic league or organization not organized for profit, but operated exclusively for the promotion of social welfare." Revenue Act of 1913, ch. 16, § II(G)(a), 38 Stat. 172.

16. Congress repeatedly recodified the statute in the ensuing years. All versions of the recodified statute have limited the tax exemption to organizations "operated exclusively" for the promotion of social welfare.

17. The current version of the Code provides a tax exemption for:

> Civic leagues or organizations not organized for profit but
> *operated exclusively* for the promotion of social welfare, or local
> associations of employees, the membership of which is limited to
> the employees of a designated person or persons in a particular
> municipality, and the net earnings of which are devoted exclusively
> to charitable, educational, or recreational purposes.

26 U.S.C. § 501(c)(4)(A) (emphasis added). Organizations subject to this provision are known

as "501(c)(4) organizations."

18. Prior to 1959, Treasury and IRS regulations promulgated to implement the statute limited the tax exemption for 501(c)(4) organizations to those "operated exclusively for purposes beneficial to the community as a whole." *See, e.g.*, Treas. Reg. 65, Art. 519, T.D. 3640, 26 Treas. Dec. Int. Rev. 745, 897 (1924); Treas. Reg. 111, § 29.101(8)-1 (1943); Treas. Reg. § 39.101(8)-1 (1954).

19. After Congress recodified the statute in 1954, Internal Revenue Act of 1954, Pub. L. No. 83-591, ch. 736, 68A Stat. 163, the IRS promulgated new regulations implementing the statutory provision providing a tax exemption for civic leagues or organizations operated exclusively for the promotion of social welfare. T.D. 6391, 1959-2 C.B. 139. Those regulations are identical in substance to the current regulations.

20. Under the current IRS regulations, a "civic league or organization may be exempt as an organization described in section 501(c)(4) if – (i) It is not organized for profit; and (ii) It is operated exclusively for the promotion of social welfare." Treas. Reg. § 1.501(c)(4)-1(a)(1).

21. The regulations also define the "promotion of social welfare" as follows:

> An organization is operated exclusively for the promotion of social welfare if it is *primarily engaged* in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is *operated primarily* for the purpose of bringing about civic betterments and social improvements.

Treas. Reg. § 1.501(c)(4)-1(a)(2)(i) (emphasis added).

22. The regulations exclude from the definition of the "promotion of social welfare" "direct or indirect participation or intervention in political campaigns on behalf of or in

opposition to any candidate for public office." Treas. Reg. § 1.501(c)(4)-1(a)(2)(ii).

23. IRS policy directives implementing these provisions provide that an organization may carry on lawful political activities and still be entitled to tax-exempt status under § 501(c)(4) as long as the organization is primarily engaged in activities that promote social welfare. Rev. Rul. 81-95, 1981-1 C.B. 332.

24. The IRS has not further defined the "primary" activity standard established by its regulations. Instead, in a revenue ruling, the IRS has provided that all facts and circumstances are taken into account in determining the "primary activity" of a 501(c)(4) organization. Rev. Rul. 68-45, 1968-1 C.B. 259.

25. Groups seeking or claiming 501(c)(4) status have interpreted the "primary activity" requirement to mean section 501(c)(4) organizations can spend up to 49 percent of their total expenditures in a tax year on campaign activities without such campaign activities constituting the "primary" activity of the organization. On information and belief, the IRS is aware of this interpretation.

26. Organizations properly functioning as tax-exempt 501(c)(4) organizations are not required to disclose to the public the names of their donors. 26 U.S.C. §§ 6104(b), (d)(3).

27. The Code also recognizes a category of organizations that operate as political organizations under section 527. Such organizations are required to either file periodic reports of contributions and expenditures on IRS Form 8872 pursuant to 26 U.S.C. §§ 527(j)(2)-(3), or register as political committees with the Federal Election Commission ("FEC") and file periodic reports with that agency disclosing their contributions and expenditures. 26 U.S.C. § 527(j)(5)(A); 2 U.S.C. §§ 434(a)-(b). In both situations, such organizations must disclose

publicly the names of contributors who donate more than $200 in each calendar year. *Id.*

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

28. On February 20, 2010, AAN submitted to the IRS Form 1024, an application to be recognized as exempt under section 501(c)(4) of the Code. AAN's Chief Executive Officer (and former Minnesota Republican Senator) Norm Coleman signed the application under penalty of perjury.

29. In its application, AAN indicated it was applying for tax-exempt status as a social welfare organization. AAN also answered "yes" to the question of whether it had spent or planned to spend any money attempting to influence the selection, nomination, election, or appointment of any person to any federal, state, or local public office or to an office in a political organization.

30. In a statement accompanying its application, AAN described its purpose as advocating for policies on a range of issues that impact the economy and national security and reflect AAN's core commitment to promoting security, prosperity, and freedom. AAN identified several activities by which it planned to fulfill its mission, including policy advocacy, citizen forums, town hall meetings, college tours, policy conferences, training programs, new media, direct lobbying, press outreach, and public outreach.

31. AAN further represented that while its primary focus would be on lobbying and educational efforts designed to promote social welfare, it also would engage in political campaign intervention on an ongoing basis, purportedly as a minor portion of its activities. AAN specified its anticipated political activities included, *inter alia*, commentary on actions or proposals of candidates for office; providing educational training and policy proposals for policy

leaders and candidates; and, in what it claimed would be unusual cases, developing and

distributing candidate surveys, voting guides, and voting records of elected officials and

candidates on issues of interest to AAN. AAN also stated it anticipated running advertisements

on behalf of candidates who support AAN's key priorities, which it represented would be within

the limits allowed by law.

32. AAN also asserted in its application to the IRS it would adopt appropriate internal

controls to ensure to the extent it engaged in political campaign intervention under federal tax

law, such activity would remain a minor, not primary, activity of AAN. AAN stated it expected

to spend less than 20 percent of its resources on political activities.

33. As support for its application, AAN cited, in part, section 1.501(c)(4)-1(a)(2) of the

Treasury regulations, which it characterized as stating an organization is operated exclusively for

the promotion of social welfare if it is primarily engaged in promoting in some way the common

good and general welfare of the people in the community and is operated primarily for the

purpose of bringing about civil betterment and social improvement.

34. At the time of its application, AAN claimed to have assets of $65,925.46. For the

period July 2010 through June 2011, it projected its total revenue to be $1,734,360, and its

expenses to be $1,677,000. For the period July 2011 through June 2012, AAN projected its total

revenue to be $1,757,360, and its expenses to be $1,727,000.

35. AAN's application listed its officers and directors, most of whom are or were then

Republican party leaders, fundraisers, former members of Congress, and/or former aides to

Republican presidents or congressional leaders. Included in this group is AAN Chairman and

Treasurer Fred Malek, the previous national finance chair of Senator John McCain's presidential

campaign, campaign manager for President George H.W. Bush in 1992, and an aide and advisor to four Republican presidents. Rob Collins, president of AAN at the time it submitted its application to the IRS, previously served as chief of staff to House Majority Leader Eric Cantor (R-VA), and worked for the National Republican Senatorial Committee, the Republican National Committee, Sen. John Thune (R-SD), and former Sen. Chuck Hagel (R-NE). AAN board member Maria Cino previously served as president of the 2008 Republican convention, deputy chair of the Republican National Committee, and executive director of the National Republican Congressional Committee.

36. On April 3, 2010, the IRS granted AAN's application for section 501(c)(4) status.

37. As a consequence of being granted 501(c)(4) status, AAN was not required to disclose publicly the identities of its donors or to report as taxable income any donations it received. On information and belief, AAN has not to date disclosed any of its donors.

38. As AAN represented to the IRS in support of its application for tax-exempt status under section 501(c)(4) of Code, it did in fact engage in political activity. In the 2010 election cycle, AAN engaged in substantial political activity, applying the standard of "primarily engaged" set forth in the IRS's regulations. Within days of receiving the IRS's approval of its section 501(c)(4) status, AAN acknowledged it planned far greater political activity in 2010 than it represented on its application. AAN Chief Executive Officer Norm Coleman announced publicly the group hoped to be active in eight to ten Senate races and 25 House races in 2010, and AAN reportedly sought to raise $25 million to fund a political advertising blitz. Days before the November 2010 election, then-AAN President Rob Collins predicted AAN would meet its $25 million fundraising goal.

39. Reports AAN submitted to the FEC of its independent expenditures and electioneering communications reveal AAN spent $18,945,602 on political activity during the 2010 election cycle. This amount included more than $4 million on independent expenditures expressly advocating the election or defeat of candidates for public office, and at least $14 million spent on electioneering communications – advertisements broadcast close to an election that mention a candidate by name.

40. During the 2010 election cycle, AAN also coordinated its political advertisements with other outside groups, including, *inter alia*, American Crossroads, Crossroads GPS, and the U.S. Chamber of Commerce. The groups worked together, targeting specific races in an effort to take down the then-Democratic House majority.

41. AAN's 2009 tax return, covering July 23, 2009 through June 20, 2010, and its 2010 tax return, covering July 1, 2010 through June 20, 2011, also document AAN's participation in political campaigns in its first two years of existence. AAN's 2009 tax returns reported total expenditures of $1,446,675, and its 2010 tax return reported total expenditures of $25,692,334. These returns, together with FEC reports of AAN's political spending between May and October 2010, reveal AAN's political activity comprised nearly 70 percent of its total spending. On information and belief, AAN has not yet filed its 2011 tax return, and is not due to file its 2012 tax return until later this year.

42. Republican political operatives have publicly credited AAN and Crossroads GPS, another 501(c)(4) organization, with making their party competitive in the 2010 elections because these groups could accept large donations they do not have to disclose.

43. Based on these activities, CREW asked the IRS by a letter dated March 8, 2011, to

investigate whether AAN was operating with the primary purpose of influencing political

campaigns in violation of its 501(c)(4) tax-exempt status.  CREW sent a second letter to the IRS

on June 7, 2012, updating its request with information from AAN's 2009 and 2010 tax returns.

To CREW's knowledge, the IRS has not acted on CREW's request for an investigation into

AAN, and AAN continues to hold itself out as a 501(c)(4) organization.

44.  In the 2012 election cycle, AAN again engaged in substantial political activity.  As

part of that activity, AAN targeted the 13th Congressional District race in Illinois for the U.S.

House of Representatives, where Democratic candidate and plaintiff Dr. David Gill was running

against Republican candidate Rodney Davis.  Reports AAN submitted to the FEC document

expenditures of $1,482,562 opposing Dr. Gill.  This was the single largest expenditure by a third-

party against Dr. Gill.

45.  In the final weeks of the campaign, AAN spent $1,019,955 on political

advertisements broadcast in the Champaign, Illinois and St. Louis, Missouri media markets.  As

the 21st largest broadcast market in the country, St. Louis is a very expensive market in which to

run advertisements.  As a result, Dr. Gill's campaign could not match the spending by AAN, and

was able to afford only some radio advertisements, a minimal number of advertisements on cable

television, and a limited number of robocalls in the St. Louis, Missouri media market.

46.  The electioneering broadcast advertisements paid for by AAN contained false

statements about Dr. Gill.  These included the statement Dr. Gill would eliminate Medicare,

citing in support his 2004 campaign website.  To the contrary, that website makes clear Dr. Gill's

proposals would have expanded Medicare to cover all Americans.

47.  As a result of these false statements, Friends of David Gill, through its legal counsel,

wrote to those stations that had broadcast AAN's false advertisements asking them to cease and desist from airing the advertisements. Friends of David Gill incurred over $900 in legal fees for the preparation of these letters.

48. Friends of David Gill suffered additional economic harm caused by the additional staff and consultants it had to pay to counter the impact of AAN's political advertisements, including the development of advertisements intended to buttress Dr. Gill's maligned reputation as a physician. This, in turn, diverted time and funds that otherwise would have been available to produce and air advertisements directed at the issues in the campaign.

49. Because of the false statements AAN aired in its advertisements opposing Dr. Gill, Dr. Gill also had to expend significant amounts of time attempting to refute the false allegations and to make fundraising appearances and calls to generate additional resources to counter the money AAN had expended against him. As a result, Dr. Gill lost wages from the reduction in his hospital working hours as an emergency room physician.

50. AAN's false statements also harmed Dr. Gill's reputation. Comments and inquiries Dr. Gill received from voters responded to the false allegations Dr. Gill wanted to destroy the Medicare program and wanted to raise everyone's taxes. The final electioneering advertisement AAN financed was designed to harm Dr. Gill's reputation as a physician by painting him as a "mad scientist."

51. The electioneering advertisements AAN ran were funded, at least in part, by Aetna as well as the Pharmaceutical Research and Manufacturers of America (PhRMA). In a political activity report Aetna, Inc. and Aetna PAC filed in 2012, Aetna reported contributing over $3.3 million to AAN in 2011. PhRMA's 2010 tax return reported a grant of $4,500,000 to AAN. On

information and belief, Aetna and PhRMA bankrolled AAN's political activities in part to defeat

Dr. Gill's candidacy because of Dr. Gill's support for a single-payer, national health care plan.

52.   Throughout Dr. Gill's race, nearly every poll showed Dr. Gill leading Mr. Davis by

margins ranging from one to nine percent.   In the final weeks of the campaign, however, the huge

expenditures by AAN harmed Dr. Gill's reputation and depressed the vote.   As a direct result,

Dr. Gill lost the race by 1002 votes, or 3/10th of one percent of the votes cast.   This was the third

closest House race in the nation in 2012, and the narrowest loss by a Democratic candidate.

**PLAINTIFF'S CLAIMS FOR RELIEF**

**CLAIM ONE**

**(For A Declaratory Judgment The IRS Regulation Is Arbitrary,
Capricious, And Contrary To Law, And An Injunction
Prohibiting The IRS From Implementing The Regulation)**

53.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully

set forth herein.

54.   Under section 501(c)(4) of the Code, only groups operating exclusively for the

promotion of social welfare are entitled to tax-exempt status.

55.   Defendant IRS's implementing regulation defining organizations operating for the

promotion of social welfare as those organizations primarily engaged in promoting in some way

the common good and general welfare of the people of the community violates the Code by

permitting organizations to engage in activity that does not promote social welfare, including

political activity.

56.   Plaintiffs are therefore entitled to relief in the form of a declaratory judgment that the

IRS regulation implementing the statutory provision for tax-exempt status for groups operating exclusively for the promotion of social welfare, Treas. Reg. § 1.501(c)(4)-1(a)(2)(i), is arbitrary, capricious, and contrary to law, and an injunction prohibiting the IRS from implementing this regulation.

## CLAIM TWO

**(For A Declaratory Judgment The IRS Regulation Is Arbitrary, Capricious, And Contrary To Law As Applied To Plaintiffs, And An Injunction Prohibiting The IRS From Implementing The Regulation)**

57.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

58.   Under section 501(c)(4) of the Code, only groups operating exclusively for the promotion of social welfare are entitled to tax-exempt status.

59.   Defendant IRS's implementing regulation defining organizations operating for the promotion of social welfare as those organizations primarily engaged in promoting in some way the common good and general welfare of the people of the community violates the Code by permitting organizations to engage in activity that does not promote social welfare, including political activity.

60.   The IRS unlawfully relied on this regulation to approve the application of AAN for tax-exempt status under 501(c)(4) of the Code, despite AAN's representations it would not be operating exclusively for the promotion of social welfare.

61.   As a result of the approval by the IRS of its tax-exempt status, AAN was not required to disclose the identities of any of its donors. AAN's ability to keep the names of its donors secret increased the amount of contributions it obtained for political activity, and allowed it to

unduly influence elections with little or no accountability.

62. As a result of the approval by the IRS of its tax-exempt status, AAN was able to participate in the 2012 election cycle by raising and spending substantial sums of anonymous money in opposition to the candidacy of Plaintiff Dr. David Gill for the U.S. House of Representatives.

63. Plaintiffs Dr. Gill and Friends of David Gill were harmed directly by the money AAN expended opposing the candidacy of Dr. Gill because they were forced to raise and spend additional funds to counteract the electioneering advertisements funded by AAN, and plaintiff Dr. Gill suffered harm to his reputation as a result of the false advertisements AAN funded.

64. In addition, CREW was harmed in its ability to publicly expose the special interests that affected the 2012 election cycle through contributions of anonymous funds to AAN because AAN was operating as a 501(c)(4) organization, thereby exempting it from the requirement to disclose the identities of all donors.

65. Plaintiffs are therefore entitled to relief in the form of a declaratory judgment that IRS regulations implementing the statutory provision for tax-exempt status for groups operating exclusively for the promotion of social welfare are arbitrary, capricious, and contrary to law as applied to plaintiffs, and an injunction prohibiting the IRS from implementing these regulations.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court:

(1) Declare the IRS regulation implementing the statutory provision for tax-exempt status for groups operating exclusively for the promotion of social welfare is arbitrary, capricious, and contrary to law;

(2) Declare the IRS regulation implementing the statutory provision for tax-exempt status for groups operating exclusively for the promotion of social welfare is arbitrary, capricious, and contrary to law as applied to plaintiffs;

(3) Enjoin the defendant from implementing its regulation implementing the statutory provision for tax-exempt status for groups operating exclusively for the promotion of social welfare;

(4) Award plaintiffs their costs, expenses, and reasonable attorneys' fees in this action; and

(5) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
D.C. Bar No. 434584
Citizens for Responsibility
 and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
202-408-5565 (telephone)
202-588-5020 (fax)
aweismann@citizensforethics.org

Attorneys for Plaintiffs

Dated: February 19, 2013